STATE of Missouri, Respondent,

v.

Cody V. HIGGINS, Appellant.

No. 61285.

Supreme Court of Missouri,
En Banc.

Dec. 6, 1979.

153

James D. Boggs, Platte City, for appellant.

John Ashcroft, Atty. Gen., Robert Presson, Asst. Atty. Gen., Jefferson City, for respondent.

RENDLEN, Judge.

I

 Convicted of first degree murder and sentenced to life imprisonment, defendant sought reversal in the Court of Appeals, Western District, but the cause was transferred here by that court on its own motion prior to opinion.[1] Considering the case as though on original appeal, we affirm.

---

1. Apparently the Court of Appeals made the transfer in the view that appellant's attack on the facial validity of the mandatory life sentence provision of § 559.009, RSMo Supp.1975 raised a question of constitutional *construction* falling within the exclusive jurisdiction of the

Supreme Court, under Mo.Const. art. V, § 3 (effective date January 1, 1972, superseded January 2, 1979).

Although the appeal involves a claim of statutory invalidity, resolution of this issue requires only *application* of settled constitutional

## A

The facts related by defendant in his written confession are these: On the evening of February 11, 1977, Higgins who had been drinking heavily, met his friend Eddie Bowman at an arcade on North Cherry Street in North Kansas City and announced that he was broke and wanted "to pull a robbery." He asked Bowman if he knew a place to rob where they wouldn't be seen. Bowman stated he did and they left in Higgins' station wagon to the North Kansas City suburbs where they settled on the Price-Rite Market on Northwest Waukomis for their proposed robbery. Armed with a .22 caliber revolver Higgins went into the store and taking the gun from his waistband, aimed it at the cashier Donna Parshall and twice demanded money. When Mrs. Parshall refused, Higgins shot her and she fell to the floor, fatally wounded. With some difficulty Higgins opened the cash door and took the money. As he was leaving an older man entered the store, whom Higgins ordered to stay back.

## B

According to eyewitnesses at the scene, Higgins then encountered a Miss Bowman (no relation to Eddie) also on her way toward the store entrance and he pointed his gun at her head ordering her to stand aside. With the gun trained on her, Higgins moved around Miss Bowman's parked car, then fired a shot into the ground, walked from the parking lot and broke into a run along the highway.

## C

Higgins stated in his confession that after the shooting he and Bowman proceeded to the latter's house where they divided the loot, about $140.00.

## D

Later that evening Higgins, while driving erratically near Olathe, Kansas on Interstate 35, was stopped by Kansas Highway Patrolmen and when questioned stated he was out driving to sober up. An officer closed the car door which Higgins left open in the traffic lane, and while so doing observed several beer cans in the car. One of the cans had been opened and was lying on the floor of the front seat with part of its contents spilled on the carpet. Three unopened beer cans were also lying on the floor. After placing defendant under arrest for driving while intoxicated the officer retrieved the cans from the car as evidence and at that time noticed the grips of a pistol protruding from beneath the driver's seat. He took the pistol, a 9-shot revolver, which contained eight live and one spent round of .22 caliber ammunition. Subsequent ballistics tests disclosed this was the murder weapon.

## E

The Kansas City Police Department, acting on information from two confidential informants and three eyewitnesses, obtained a fugitive warrant for Higgins' arrest which was transmitted to police authorities in Bakersfield, California where Higgins was thought to have fled. At about 4:00 p.m. on February 16, 1977, Higgins and his companion Jeanette Olds were arrested outside of Bakersfield and the next day, two Kansas City detectives arrived to transport him to Missouri. Higgins, who had consulted with an attorney earlier in the day, waived his privilege against self-incrimination, confessed his involvement in the crimes[2] and waiving extradition was brought to Missouri for trial.

principles rather than *construction* of the United States Constitution or the Constitution of Missouri, *State v. Motley*, 546 S.W.2d 435, 438 439 (Mo.App.1976); *City of Florissant v. Rouillard*, 495 S.W.2d 418, 420 (Mo.1973) and accordingly does not fall within our exclusive jurisdiction. Nevertheless we retain the appeal in the interest of judicial economy. Rule 83.06. *Foremost-McKesson, Inc. v. Davis*, 488 S.W.2d 193, 196 (Mo.banc 1972).

2. Higgins also signed a written document denominated as a "Consent to Search" authorizing a search of his car and trailer.

## II

Defendant first contends that the provision of § 559.009(3), RSMo Supp.1975,[3] prescribing a life sentence for conviction of first degree murder, constitutes cruel and unusual punishment in violation of the eighth and fourteenth amendments of the United States Constitution and art. I, § 21 of our Missouri Constitution. Application of clearly established constitutional principles leads to rejection of this contention.

The eighth amendment of the United States Constitution and art. I, § 21 of the Missouri Constitution mandate that the legislature exercise its power to punish for criminal offenses " 'within the limits of civilized standards'." *Woodson v. North Carolina,* 428 U.S. 280, 288, 96 S.Ct. 2978, 2983, 49 L.Ed.2d 944 (1975); *Trop v. Dulles,* 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).

While the framers of the federal constitution may well have sought only to prevent cruel and barbarous punishments amounting to torture, see Granucci, *Nor Cruel and Unusual Punishments Inflicted: The Original Meaning,* 57 Cal.L.Rev. 839 (1969) and though many cases[4] stress this aspect of eighth amendment protection, it has long been recognized that the eighth amendment is susceptible to broader application. Today it is clear that the eighth amendment forbids excessive as well as barbarous punishments. *Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977); *State v. Mitchell,* 563 S.W.2d 18, 26 (Mo.banc 1978); *State v. Agee,* 474 S.W.2d 817, 822 (Mo.1971); *State v. Motley,* 546 S.W.2d 435, 438 (Mo.App.1976). The ultimate question is whether the punishment is disproportionate to the crime for which it is imposed. *Gregg v. Georgia,* 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 929 (1975). *State v. Agee,* 474 S.W.2d 817, 822 (Mo.1971); *State v. Johnson,* 549 S.W.2d 348, 352 (Mo.App. 1977). When determining the constitutionality of legislatively prescribed punishment it must first be noted that we presume its validity and those who seek invalidation bear a heavy burden of demonstrating that the statutory punishment is barbarous or excessive.[5] *Gregg v. Georgia,* 428 U.S. 153, 175, 96 S.Ct. 2909, 49 L.Ed.2d 929 (1975); *State v. Mitchell,* 563 S.W.2d 18, 26 (Mo. banc 1978). Defendant has failed to meet that burden.

No crime is so disruptive of peace and order or more violative of the rights of the individual than murder. The security and lives of its members are the first objects of organized society and we cannot say that the legislature erred in punishing with a mandatory term of life imprisonment those who intentionally take life or kill in the course of a felony. An examination of the legislative enactments of other states supports this view. More than two-thirds of our sister states attach a penalty of mandatory life imprisonment to the crime of first degree murder.[6] While such a "he-

3. Section 559.009(3), RSMo Supp.1975, applicable here, was repealed by the legislature, effective May 26, 1977, and replaced by the identical provision, § 565.008(2), RSMo 1978. The pertinent language is, "Persons convicted of murder in the first degree shall be punished by imprisonment by the division of corrections during their natural lives."

4. See *Wilkerson v. Utah,* 99 U.S. 130, 25 L.Ed. 345 (1878) and *In re Kemmler,* 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890).

5. The United States Supreme Court recently stated, "[L]egislatures remain free to decide how much discretion in sentencing should be reposed in the judge or jury in noncapital cases * * * *Lockett v. Ohio,* 438 U.S. 586, 603–604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1976).

6. Those states are: Alabama, Ala.Code tit. 13, § 1–74; Arizona, Ariz.Rev.Stat. § 13–703; Colorado, Colo.Rev.Stat. § 18–3–102(3) and § 18–1–105, Delaware, Del.Code tit. 11, § 4209; District of Columbia, D.C.Code § 22–2404; Florida, Fla.Stat. § 921.141; Georgia, Ga.Code § 26–1101; Idaho, Idaho Code § 18–4004; Iowa, Iowa Code § 707.2 and § 902.1; Kansas, Kan.Stat. § 21–4501; Louisiana, La.Rev.Stat. Ann. § 14.30 (West); Maryland, Md.Crim.Law Code Ann. § 27–412, Massachusetts, Mass.Gen. Laws.Ann. ch. 265, § 2 (West); Michigan, Mich.Stat.Ann. § 750.316; Minnesota, Minn. Stat.Ann. § 609.185 (West); Mississippi, Miss. Code Ann. § 97–3–21; Nebraska, Neb.Rev.Stat. § 28–401; Nevada, Nev.Rev.Stat. § 200.030(4); New Hampshire; N.H.Rev.Stat.Ann. § 630:1–a; New Mexico, N.M.Stat.Ann. § 31–18–2; North Carolina, N.C.Gen.Stat. § 14–17; Ohio, Ohio

adcount" is not controlling, the fact that a strong majority of jurisdictions have also adopted mandatory life sentences for first degree murder, lends credence to the view that our legislature's action is neither excessive nor capricious.[7]

No cases have been suggested and none have been found holding a mandatory life sentence for murder violates those provisions of the Missouri or the federal constitutions.[8] The Minnesota Supreme Court, declaring that a mandatory life sentence for the crime of murder did not constitute cruel and unusual punishment, stated further that such sentences serve the legitimate legislative purpose of assuring that violent offenders do not return to society prematurely. *State v. Walker,* 306 Minn. 105, 235 N.W.2d 810, 814–815 (1975), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3172, 49 L.Ed.2d 1187 (1976).

Finally, because the death penalty may be prescribed for murder, *Gregg v. Georgia,* 428 U.S. 153 at 187, 96 S.Ct. 2909, 49 L.Ed.2d 929 (1976), it follows that the penalty of mandatory life imprisonment for this most heinous of crimes is constitutionally permissible. We hold that § 559.009(3), RSMo Supp.1975 does not constitute cruel and unusual punishment in-so-far as it prescribes a mandatory sentence of life imprisonment for convictions of first degree murder.

### III

■ Defendant next contends the mandatory sentence of life imprisonment provided by § 559.009, RSMo Supp.1975 violates Missouri Constitution art. II requiring the separation of governmental power [9] by interfering with an inherent judicial power to exercise discretion and to impose only such punishment as the Court may deem appropriate.[10] Such has never been the law of this State and, as we shall presently discuss, is supported by scant authority elsewhere.

It has been consistently held that fixing punishment for a crime defined by statute is the province of the legislature, not the courts. *State v. Alexander,* 315 Mo. 199, 285 S.W. 984, 985 (1926); *State v. Wheeler,* 318 Mo. 1173, 2 S.W.2d 777, 779 (1928); *State v. Motley,* 546 S.W.2d 435, 437 (Mo. App.1976); see cases cited, Missouri Digest under Constitutional Law, ▬▬▬ Indeed, if we were to hold that the Court

---

Rev.Code Ann. § 2929.02; Oklahoma, Okl.Stat. tit. 21, § 701.9; Pennsylvania, 18 Pa.Cons.Stat. Ann. § 1102; Rhode Island, R.I.Gen.Laws § 11–23–2; South Carolina, S.C.Code § 16–3–20; South Dakota, S.D.Compiled Laws Ann. § 22–16–12 and § 22–6–1; Tennessee, Tenn. Code Ann. § 39–2402; Utah, Utah Code Ann. § 76–5–202 and 76–3–206; Vermont, Vt.Stat. Ann. tit. 13, § 2303; Washington, Wash.Rev. Code § 9A–32.040; West Virginia, W.Va.Code § 61–2–2; Wisconsin, Wis.Stat.Ann. § 940.01 and § 939.50; Wyoming, Wyo.Stat. § 6–4–101.

**7.** At least three jurisdictions have prescribed mandatory sentences for offenses less serious than murder. Texas, Tex.Penal Code Ann. tit. 1 § 12.42(d) and West Virginia, W.Va.Code § 61–11–18 impose mandatory life sentences on *thrice convicted recidivist felons.* New York has a mandatory life sentence for all class A drug felonies. N.Y.Penal Law § 70.00 subd. 2(a) (McKinney).

**8.** Several courts have recently upheld mandatory life sentences for less serious crimes in the face of eighth amendment challenges. New York's mandatory life sentence for all class A drug felonies was sustained in *People v. Broadie,* 37 N.Y.2d 100, 371 N.Y.S.2d 471, 332

N.E.2d 338 (1975), *cert. denied,* 423 U.S. 950, 96 S.Ct. 372, 46 L.Ed.2d 287 (1975); *Carmona v. Ward,* 576 F.2d 405 (2d Cir. 1978), *cert. denied,* 439 U.S. 1091, 99 S.Ct. 874, 59 L.Ed.2d 58 (1979).

**9.** Art. II of the Missouri Constitution has been retained unchanged in all crucial aspects since the adoption of Missouri's original (1820) Constitution.

**10.** Defendant also appears to argue that mandatory sentencing provisions invade an inherent judicial power to grant probation, though it has been held that the power to grant probation derives from legislative authorization and is *not* inherent to the judicial power. *State v. Motley,* 546 S.W.2d 435, 437 (Mo.App.1976). However, we need not reach that issue here. Section 549.061, RSMo 1978, authorizes circuit courts to grant probation in all cases except for certain recidivist drug offenders and those convicted of capital murder. Higgins was convicted of first degree murder and no statute prevented the trial court from granting probation in such cases.

could assess a punishment not authorized by statute, it would constitute an usurpation of legislative authority. The consequences of such a position were perceived more than half a century ago by the United States Supreme Court in *Ex parte United States,* 242 U.S. 27, 42, 37 S.Ct. 72, 74, 61 L.Ed. 129 (1916), which stated:

[I]f it be that the plain legislative command fixing a specific punishment for crime is subject to be permanently set aside by an implied judicial power upon considerations extraneous to the legality of the conviction, it would seem necessarily to follow that there could be likewise implied a discretionary authority to permanently refuse to try a criminal charge because of the conclusion that a particular act made criminal by law ought not to be treated as criminal. And thus it would come to pass that the possession by the judicial department of power to permanently refuse to enforce a law would result in the destruction of the conceded powers of the other departments, and hence leave no law to be enforced.

Notwithstanding this line of authority defendant would have us hold otherwise and relies on *State v. McCoy,* 94 Idaho 236, 486 P.2d 247 (1971), to support his position.[11] *McCoy* involved an Idaho statute requiring a minimum 10 day sentence upon conviction for driving under the influence of intoxicating liquors. 486 P.2d at 248. The Idaho Court concluded that the judiciary possessed the power under the English common law to suspend sentence. Pressing on, the Idaho court discovered that the power to suspend all or any part of a sentence, "is in the nature of an inherent right of the judicial department and one which the separation of powers concept in our system of government places above and beyond the rule of mandatory action imposed by legislative fiat." 486 P.2d 247 at 251. We reject the result and rationale of that decision.

In Missouri it has been recognized that the judiciary has no power, absent legislative authority to indefinitely stay execution of sentence, *Ex parte Thornberry,* 300 Mo. 661, 254 S.W. 1087, 1090 (Mo.banc 1923); *State ex rel. Oliver v. Hunt,* 247 S.W.2d 969, 973 (Mo.banc 1952), and this court is neither authorized nor willing to substitute its "enactments" on the basis of judicial predilections as to sentencing for the statutes of the legislature.

Mr. Justice Frankfurter noted, in response to a similar contention, that "In effect we are asked to enter the domain of penology, and more particularly that tantalizing aspect of it, the proper apportionment of punishment. Whatever views may be entertained regarding severity of punishment, whether one believes in its efficacy or its futility [citations omitted] these are peculiarly questions of legislative policy." *Gore v. United States,* 357 U.S. 386, 393, 78 S.Ct. 1280, 1285, 2 L.Ed.2d 1405 (1958).

We hold that § 559.009(3), RSMo Supp. 1975 did not violate art. II of the Missouri Constitution and that a contrary position would improperly inject the courts into the legislative province.

### IV

For his next contention defendant states the trial court erred in denying his motion to suppress and allowing his confession (given to the Kansas City police detectives at the Kern County jail in Bakersfield, California) to be admitted in evidence. He argues the confession was involuntary and obtained in violation of the fifth, sixth and fourteenth amendments to the United States Constitution as well as art. I, § 18(a) and 19 of the Constitution of the State of Missouri. Further, that the Uniform Criminal Extradition Act was violated by the circumstances of his transportation from California to Missouri for trial.

■ Although the issue of voluntariness is necessarily a mixed question of law and

---

11. The *McCoy* decision has been the object of much criticism even within Idaho. See McMeen, *The Constitutional Power of Idaho Courts to Suspend Sentence: The Uncertain* *Meaning of State of Idaho v. McCoy,* 11 Idaho L.Rev. 29 (1974); *State v. Lindquist,* 99 Idaho 765, 589 P.2d 101, 110 (1978) (dissenting opinion).

fact, we first give due regard to the trial court's opportunity to judge the credibility of the witnesses (Rule 73.01(3)(b), applicable in criminal appeals by Rule 28.18) and in that frame of reference determine whether the trial court's finding of voluntariness is supported by substantial evidence. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo.banc 1976).

■ At the outset we recognize that once a defendant has challenged the admissibility of a statement or confession made while in police custody, the burden is on the state to demonstrate its elicitation comported with controlling constitutional requirements and that the statement was voluntarily made. *State v. Olds,* 569 S.W.2d 745, 751 (Mo.App.1978); *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1977).

■ The test for "voluntariness" is whether the totality of the circumstances deprived defendant of a free choice to admit, to deny, or to refuse to answer, and whether physical or psychological coercion was of such a degree that defendant's will was overborne at the time he confessed. As the United States Supreme Court recently noted the rubric of voluntariness has, "reflected an accommodation of the complex of values implicated in police questioning of a suspect." *Schneckloth v. Bustamonte,* 412 U.S. 218, 224–225, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973). Important to such inquiry is the presence or absence of advice concerning the defendant's constitutional rights. *State v. Glenn,* 429 S.W.2d 225, 232–233 (Mo.banc 1968).

■ Here, despite defendant's protestations that the statement was coerced by promises of benefit and threats of harm, there is substantial evidence to support the finding that it was in fact voluntary. Higgins admitted that prior to his statement he was advised of his rights by the *Miranda* warning, that he understood those rights, and nevertheless spoke with the officer. While the presence or absence of *Miranda* warnings is not the sole criterion of voluntariness it is an important fact to consider. *State v. Glenn,* 429 S.W.2d at 233. The apparent voluntariness is enhanced by the

fact that Higgins had spoken with an attorney prior to making his statement. Further, defendant's testimony on this matter is replete with inconsistencies and when compared to the specific denial of any coercive practices by the detectives, we defer to the trial court's action stemming from the apparent belief that the state's evidence was more credible. *State v. Anderson,* 384 S.W.2d 591, 604 (Mo.banc 1964). We find the court's denial of the motion to suppress and admission of the statement in evidence were not error.

Finally, defendant would have us rule that the violation of the Uniform Criminal Extradition Act, § 548.011 et seq., RSMo 1978, mandates exclusion of all subsequent statements. We do not reach this novel contention because the Act was not violated. The Act provides: "[N]othing in this section shall be deemed to limit the rights of the accused person to return voluntarily and without formality to the demanding state; nor shall this waiver procedure be deemed to be the exclusive procedure or to limit the powers, rights, or duties of the officers of the demanding state or of this state." § 548.260(2), RSMo 1978; Cal.Penal Code § 1555.1 (West). The record discloses no violation. Instead the credible testimony demonstrated that defendant voluntarily waived extradition procedures and of his own free will accompanied the officers to Missouri. The contention is denied.

## V

Next defendant argues certain investigative techniques utilized by the police were so suggestive that they rendered defendant's in-court identification by two eyewitnesses unreliable and the court's denial of defendant's motion to suppress such identification testimony constituted reversible error.

As defendant fled the store where the robbery and murder occurred, he was seen by three customers, Mr. Agee, Mrs. Agee and Miss Bowman, each of whom signed a written statement the night of the homicide. The next day, all participated in the creation of a composite drawing and while

none was completely satisfied with the drawing produced by the police artist it bears a remarkable resemblance with defendant's photograph.

The following day, Sunday, February 13, all three went to the sheriff's office in Liberty to view photographs. Although they were unable to make a positive identification, Mr. and Mrs. Agee tentatively identified a photo of a man who was not Cody Higgins as resembling the gunman.

Later that day Officer Riddell of the Kansas City Police Department showed an array of 5 photos to the witnesses. Mr. and Mrs. Agee were shown the photos by placing them upon a counter and both looked at them closely. Mr. Agee was unable to make a positive identification. Mrs. Agee selected Higgins picture but she too was unable to make a positive identification. Riddell could not remember what he told Mrs. Agee before showing her the photos, but Mrs. Agee was certain that Riddell did not say that the "police had in fact arrested a suspect the night of the homicide . . ."

Riddell displayed the photo spread array to Miss Bowman at her place of employment. Although he was unsure, he stated that he probably told her that police had in mind a suspect who was arrested the night of the homicide. She recalled only that Riddell stated he had pictures he wanted her to view. Riddell set five pictures on a console as Miss Bowman's back was turned, she then turned around and *almost immediately* selected Higgins' photograph from the array. It was not until after her identification of defendant's photograph that Riddell told her the picture selected was that of the suspect the police had in mind. While Mr. Agee testified at trial, only Mrs. Agee and Miss Bowman identified Higgins in court.

■ Utilization of photographs can be a valuable and proper aid to identification or release of suspects in police investigatory procedures. "Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1967). The danger to be guarded against is that, "photographic identification procedure [will be] so impermissibly suggestive as to give rise to a very substantial likelihood of *irreparable misidentification.*" Id. at 384, 88 S.Ct. at 971 (1967). (Emphasis supplied.) *State v. Parker,* 458 S.W.2d 241, 243 (Mo.1970). Whether this danger exists in a particular case depends on the totality of the surrounding circumstances. *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1967); *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1966); *State v. Parker,* 458 S.W.2d 241, 244 (Mo.1970).

The resolution of this issue requires a two-step analysis. Were the investigative procedures employed by the police impermissibly suggestive? If so, were they so impermissibly suggestive as to create a very substantial likelihood of an irreparable misidentification at trial? *State v. Charles,* 542 S.W.2d 606, 609 (Mo.App.1976). *State v. McDonald,* 527 S.W.2d 46, 49 (Mo.App.1975). The answer to both questions in the case *sub judice* is in the negative, hence defendant's contention is not well taken.

■ Examining the "totality of the circumstances," *Stovall v. Denno,* 388 U.S. at 302, 87 S.Ct. 1967, we cannot agree that the photo spread techniques employed here were impermissibly suggestive. An array of 5 photographs (apparently "mug shots") were exhibited to the witnesses. Each showed a young Caucasian male with long hair with similar styles of facial hair. According to Bowman, the photo of Higgins' had been placed in one of the three middle positions. The only aspect of suggestiveness we discern from the record is that Detective Riddell may have informed Bowman that the police had in mind a suspect arrested on the night of the offense and that Higgins' mug shot bore a corresponding date. Bowman had no recollection such a statement was made and Riddell's testi-

mony is inconsistent on the point. If it in fact occurred the statement had no measurable effect as Miss Bowman identified Higgins immediately when she turned and saw the photographs.

■ Assuming arguendo the photo spread techniques were impermissibly suggestive, we find no want of due process in the trial court's rulings on the identification testimony. Reliability, not suggestiveness, "is the linchpin in determining the admissibility of identification testimony . . ." *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *State v. Carter*, 572 S.W.2d 430, 435 (Mo. banc 1978) and reliability of the in-court identification testimony is to be assessed under the "totality of the circumstances." [12] *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *State v. Carter*, 572 S.W.2d 430, 435 (Mo. banc 1978); *State v. Charles*, 542 S.W.2d 606, 609 (Mo.App. 1976). Factors to be considered include: (1) The opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

Mrs. Agee and Miss Bowman had ample opportunity to view defendant. Mrs. Agee saw him through the plate glass window of the well lighted store and as he exited pursuing a circuitous route through the well lighted parking lot.[13] She observed the gunman between 5 and 10 seconds. Miss Bowman arrived as the gunman was com-

ing from the store, he pointed a gun at her head, told her to stay back, and walked around her vehicle firing a shot into the ground as he passed. He was at most 20 to 25 feet from Miss Bowman and she had a clear view as "he was looking straight at [her]." The gunman's movements and physical features were readily perceived by both women and their detailed description of defendant's physical features, clothing, and movements demonstrated that each observed the questioned events with the highest level of attention. Moreover, the witnesses' descriptions of the gunman were remarkably consistent from the time of their original statement on the night of the murder, through their collaboration on the composite drawing, to their testimony, at trial. While a testimonial discrepancy appears concerning defendant's facial hair, this may be explained by the fact that Higgins admitted he had about a day's growth of facial hair on the date of the offense. Whether Higgins had a "beard" or was "clean shaven" became a question for the jury to weigh.

■ Pamela Bowman evidenced a high degree of certainty in her identification of Higgins' photograph. When shown the array she immediately identified Higgins as' the gunman. Mrs. Agee tentatively identified someone other than Higgins as the gunman two days after the incident. Then two days later she made a tentative identification of Higgins. Because of her otherwise detailed and consistent identification testimony and her observation of Higgins at the scene her positive in-court identification was not rendered inadmissible. *State v. Cummings*, 445 S.W.2d 639, 642 (Mo.1969). When asked at trial if it was possible for

12. Defendant's reliance on *United States v. Wade*, 388 U.S. 218, 219–220, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and *Gilbert v. California*, 388 U.S. 263, 269, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) is misplaced. Those cases involved post-indictment lineups conducted in the absence of counsel and are distinguishable on that basis. *State v. Bibbs*, 461 S.W.2d 755, 757 (Mo.1970); *State v. Townes*, 461 S.W.2d 761, 763 (Mo.1970), *cert. denied*, 407 U.S. 909, 92 S.Ct. 2445, 32 L.Ed.2d 683 (1972). Moreover, in *Wade* at 388 U.S. at 240–241, 87 S.Ct. 1926,

and *Gilbert* at 388 U.S. at 272, 87 S.Ct. 1951, the Court refused to adopt a per se exclusionary rule for the admissibility of *in-court* identifications of the sort challenged here. Further, in this case the suggestive confrontation techniques detailed in *Wade* are not present.

13. The store lights were burning, there were lights in front of the store, a street light illuminated the parking lot, and Miss Bowman's car lights were on.

other persons to have the same description as that she had given the police she replied, "The same description but not the same face."

 The fact that Mr. Agee did not testify at trial does not vitiate the admissibility of the other witnesses' identification testimony. *State v. Knox,* 529 S.W.2d 455, 462 (Mo.App.1975).

 As Miss Bowman positively identified Higgins within a week and Mrs. Agee made her tentative identification within that period, the time lag cannot be said to have destroyed the reliability of their testimony. Having appraised the circumstances of the witnesses' identification process we conclude that their testimony was reliable and its admission not violative of due process rights under either the fourteenth amendment, art. 1, § 21 of the Missouri Constitution.

Finally, it should not go unnoted that defendant in his confession not only admitted his presence at the scene but detailed the facts leading to and from as well as his performance of the act of murder.

## VI

 It is next asserted that the search of defendant's automobile and the seizure of the murder weapon violated rights guaranteed defendant under the fourth amendment to the United States Constitution and art. I, § 15 of the Missouri Constitution. See I–D above for a discussion of the relevant facts.

The officers had probable cause to stop the car, to believe Higgins was driving while intoxicated and seize the beer cans then in open view on the floor of the stopped vehicle. See *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); *State v. Achter,* 512 S.W.2d 894, 903 (Mo.App.1974). The inadvertent discovery of the pistol was not the result of a search. Instead, as in *State v. Rankin,* 477 S.W.2d 72, 75 (Mo.1972), the pistol was observed in "plain view" by offi-

cers entitled to be where they were. Thus no search in the constitutionally prohibited sense occurred. The contention is meritless.

## VII

 At the close of the evidence the trial court refused a proffered, non-MAI "identity" instruction and defendant complains of that refusal.[14] For some years it has been the rule that whether to give a separate cautionary instruction on the issue of identity is a matter resting in the sound discretion of the trial court. *State v. Collor,* 502 S.W.2d 258, 259 (Mo.1973); *State v. Taylor,* 472 S.W.2d 395, 402 (Mo.1971). A claim such as that at bar was made in *State v. Thomas,* 541 S.W.2d 775, 777 (Mo.App. 1976), which the court rejected because (a) there was sufficient believable identification testimony and (b) the importance of identity and the dangers of misidentification were extensively dealt with during direct examination, cross-examination and argument to the jury. Here extensive direct and cross-examination occurred on the issue of identity and the possibility of misidentification. Further the question of identification was extensively argued to the jury. For these reasons we find no error. Moreover, the court was justified in its action because the tendered identity instruction was not " . . . simple, brief, impartial, and free from argument" as required by Rule 20.02(d). *State v. Sloan,* 575 S.W.2d 836, 837 (Mo.App.1978). There was no abuse of discretion in the trial court's refusal to give the proffered non-MAI instruction. *Id.*

## VIII

 Defendant insists the court erred in overruling his motion for disclosure as to confidential informants. *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), described a governmental privilege protecting the anonymity of informants and indicated that the boundaries of this privilege would require a case by case

---

14. The proffered instruction appears in an opinion by the Court of Appeals, D. C., *United States v. Telfaire,* 152 U.S.App.D.C. 146, 469 F.2d 552 (D.C. Cir. 1972).

balancing of the public interest in encouraging the provision of information to the police against the defendant's right to prepare his defense. In this case we have reviewed the in-camera testimony concerning the information provided the Kansas City police by the confidential informants. The informants neither witnessed nor participated in the actions preliminary to or the commission of the crime. The information provided was based principally on hearsay and the overhearing of statements of the *defendant going* solely to the question of probable cause for issuance of an arrest warrant. In *McCray v. Illinois,* 386 U.S. 300, 312–313, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967), it was stressed that an informant's identity need not be disclosed when his testimony solely went to procedural aspects of the criminal proceedings, such as the presence of probable cause. We find no abuse of discretion in the trial court's denial of the request to disclose the confidential informant's identity. *State v. Redding,* 357 S.W.2d 103, 108 (Mo.1962); *State v. Edwards,* 317 S.W.2d 441, 447 (Mo. banc 1958).

## IX

■ Defendant next contends the trial court erred by admitting in evidence photographs of the body of the victim which he claims were gruesome and prejudicial. The holding in *State v. Ford,* 585 S.W.2d 472 (Mo. banc 1979) is appropriate here. The photos were a true and accurate representation of the objects and scene represented and were relevant to issues of fact, hence the fact they are characterized by the defense as gruesome does not in itself render the photos inadmissible. The murder produced a dead person and the photographs in question go to that fact. *Id.* at 474. We have examined the photos of the corpse and while they could be described as grisly they are relevant to various elements in the charge. They establish the identity

of the body upon which the autopsy was performed as well as the nature and location of the wounds. They also demonstrate that the victim was indeed shot and are corroborative of the pathologist's testimony as to the cause of death. The nature and location of the wounds are relevant to questions of intent and defendant's state of mind pertinent to the three levels of homicide submitted by the instructions. The question of *mens rea* was crucial. Having determined that the probative value of the photographs was substantial and that this probative value was not outweighed by the claimed prejudice, we conclude that the trial judge did not abuse his discretion in admitting the photographs into evidence.

## X

■ Defendant also argues his conviction should be reversed because of a technical defect in the information charging him with first degree murder which miscited the statutory sections defining the offense and prescribing the punishment. While Rule 24.01(a) requires the citation of the sections of the Revised Statutes for the offense charged and its punishment, Rule 24.11 [15] provides that no judgment of conviction shall be affected unless substantial rights of the defendant are prejudiced on the merits as a result of the flaw in the information.

As the language of the information clearly connotes that defendant was charged with first degree murder and defendant's counsel was aware before trial of the offense charged and the prescribed punishment, we find no prejudice to defendant resulted.

## XI

■ Finally defendant asserts the evidence was insufficient for conviction because the trial court erred in overruling appellant's judgment for acquittal. This

**15.** Rule 24.11 provides in relevant part:

No indictment or information shall be deemed invalid, nor shall the trial, judgment or other proceedings thereon be stayed, arrested or in any manner affected: . . . for any surplusage or repugnant allegation

when there is sufficient matter alleged to indicate the crime and person charged . . . for any other defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits · · · ·

point is meritless. We need but mention the identification testimony of the eyewitnesses that Higgins was the gunman, the ballistics test which demonstrated the weapon which killed Miss Parshall was the weapon possessed by defendant when stopped some three hours later and, of course, defendant's detailed confession to the crime. Affirmed.

BARDGETT, C. J., DONNELLY and WELLIVER, JJ., WELBORN, Special Judge, and FINCH, Senior Judge, concur.

SEILER, J., concurs in result in separate opinion filed.

MORGAN, J., not sitting.

HIGGINS, J., not participating because not a member of the Court when cause was submitted.

SEILER, Judge, concurring in result.

I concur in result, as there is evidence linking defendant to the crime other than eyewitness identification which has a strong aspect of police suggestion to it. The example of this case, however, impels me to say something about eyewitness identification in general. Of the three eyewitnesses, one, Mr. Agee, did not identify defendant as the gunman and tentatively identified someone other than defendant. Mrs. Agee at first agreed with her husband in the tentative identification of someone else as the gunman and then when shown more photographs she and her husband still were not able to make a positive identification.

Miss Bowman, according to officer Riddell's own testimony, was probably told by him when he prepared to show her the photographs that the police had in mind a suspect who was arrested the night of the homicide, February 11, 1977. In the five photographs shown Miss Bowman, defendant's picture was the only one bearing the date 2–11–77. The figures stand out prominently in the photograph. They are about the same size as the length of the suspect's nose. As soon as she picked out defendant's photograph, the officer made "an exclamation of happiness," as she put it, and confirmed the fact that this was the suspect the police had in mind. This provided strong reinforcement for her opinion from an authority figure. Miss Bowman, incidentally, was unable to say whether there was any hair on the face of the man she saw come out of the store with the gun in his hand—no beard or moustache as she related it to the police. Yet the photograph she selected shows defendant with a beard and moustache. The composite sketch of the suspect, which Miss Bowman helped create, showed a man with a beard and moustache. To some the sketch looks like defendant's photograph, to others it might not at all.

It is true that the requirements of the *Wade-Gilbert-Stovall* cases have been limited to apply to post-indictment lineups, but the concern which gave rise to those opinions is the "very real danger of mistaken identification as a threat to justice." *United States v. Telfaire,* 152 U.S.App.D.C. 146, 149, 469 F.2d 552, 555 (D.C. Cir. 1972). That danger can exist before as well as after indictment. In the *Wade* case, the majority opinion quoted Mr. Justice Frankfurter as saying " 'What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials.' " The opinion goes on to say: "A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification . . . Suggestion can be created intentionally or unintentionally in many subtle ways . . .", *United States v. Wade,* 388 U.S. 218, 228–29, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967).

A note in a recent law review, Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification, 29 Stan.L.Rev. 969 (1977) discusses the psychology of testimony

and scientific studies on the fallibility of perception, the unreliability of memory and the inaccuracy of eyewitness testimony. It discusses perceptual selectivity, time perception, poor observation conditions, stressful situation, expectancy, personal needs and biases, cross-racial identification, memory decay over time, filling gaps in memory, inadequacy of verbal descriptions, suggestion in the composition and administration of an identification test, and social psychological influences.

I believe it is worthwhile to quote certain concluding passages of the article (29 Stan. L.Rev. at 1028–29):

> For years, members of the legal community have suspected that mistaken eyewitness identifications often send innocent people to prison and even death. Psychological research data amassed over the past 80 years confirm the unreliability of much eyewitness testimony: Psychologists can now point to a large number of cognitive and social factors that subtly but powerfully distort a witness' perception, memory and recall of an event. Moreover, many of these factors repeatedly arise in criminal cases yet do not suggest themselves intuitively to jurors as causes for doubting the reliability of identification evidence. In fact, jurors often rely unquestioningly on eyewitness identifications as the most trustworthy evidence available.
>
> Although courts long have recognized these dangers, they have done little to reduce the likelihood of such miscarriages of justice. The Supreme Court tackled only a relatively minor portion of the problem when, in the landmark *Wade* trilogy, it afforded the right to counsel and due process protection to pretrial identification procedures. Moreover, in the years since those decisions, the Court has qualified the principles they embodied so thoroughly that the protection now offered to the criminal defendant is minimal at best.
>
> Other safeguards that the criminal justice system provides also fail adequately to protect the defendant from wrongful conviction due to inaccurate eyewitness testimony. No amount of cross-examination can reveal the numerous suggestive influences that subtly bias the recollections of an honest but mistaken witness, and even the most eloquent of closing arguments will not persuade a jury to disregard sincere and apparently truthful eyewitness testimony. Similarly, cautionary jury instructions, even when they effectively focus the jurors' attention on the identification issue, do not provide them with any information with which to evaluate its worth. The remedies of exclusion and corroboration, on the other hand, go too far and undoubtedly would lead to the acquittal of many truly guilty defendants.
>
> This Note proposes another safeguard: the admission at trial of expert testimony on the cognitive and social factors affecting the reliability of eyewitness identification evidence. When used in conjunction with the traditional devices of cross-examination, closing argument and jury instructions, the psychologist's testimony can help the trier of fact to apply the scientific information on the process of perception, memory and recall to the case at hand in order to evaluate meaningfully the eyewitness evidence.
>
> Finally, the psychologist's expert testimony satisfies the traditional standards and principles governing the admission of expert testimony. In fact, the amount and quality of psychological research in this area has progressed to the point at which courts can no longer afford to ignore totally the development of experimental psychology as a science, at least when the liberty and even lives of criminal defendants hang in the balance.[1]

1. A footnote at this point in the article gives use of radar in speed detection devices as an example of the evolutionary process in use of evidence of scientific nature. At first the courts were unwilling to accept the devices as having sufficient scientific accuracy. Now many courts take judicial notice that radar is sufficiently reliable so as to dispense with proof of its general scientific reliability.