**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Terry Lee MADEWELL,
Defendant-Appellant.**

**No. 11569.**

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 8, 1980.

David R. Fielder, Fielder, Jones & Conklin, Springfield, for defendant-appellant.

John Ashcroft, Atty. Gen., Nancy D. Kelley, Paul R. Otto, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

FLANIGAN, Chief Judge.

A jury found defendant guilty of uttering a forged instrument, § 561.011 RSMo 1969, and he was sentenced to a term of six years. Defendant appeals.

Defendant's first point is "the trial court erred in ruling on defendant's motion to suppress after defendant had filed an application for disqualification of judge prior to said ruling for the reason that the ruling judge had no jurisdiction to enter said order and was biased and prejudiced against defendant, thus depriving defendant of due process of law."

Before August 2, 1979, the case was set for jury trial on August 13. On August 2 an evidentiary hearing was held before Hon. John C. Crow, Judge of Division 2 of the Circuit Court of Greene County. The motion had been filed four weeks previously. At the conclusion of the hearing Judge Crow gave each side permission to file briefs on or before 5. p. m. on August 6. On the morning of August 6 the state filed its brief and at 4:22 p. m. on that date defendant filed his brief.

On Tuesday morning, August 7, Judge Crow, after reviewing the evidence and the briefs, "concluded that the motion should be denied." As a courtesy to counsel, Judge Crow asked his secretary to notify counsel of the ruling and the secretary did so by telephone. Later that morning the defendant, through his attorney Blythe Crist-Brown, filed an affidavit to disqualify Judge Crow. Later that day Judge Crow made a docket entry reading as follows:

"Court determines that deft's motion to suppress identification testimony should be denied. Attys Thomas and Crist-Brown advised by phone and further advised that Court's findings will be dictated into record at outset of trial. Affidavit in support of disqualification of judge filed by atty for deft. Court's findings and ruling on motion to suppress identification dictated to Court Reporter Rader. Motion to suppress identification testimony denied. Application for disqualification of judge sustained. Cause transferred to Division 1."

At the time of the instant proceedings, Rule 30.12, Missouri Rules of Court, 1979, was in effect. That rule provided that an affidavit seeking to disqualify a judge on the ground of prejudice "must be filed not less than five days before the day the case has been set for trial." Rule 31.01, also in effect at that time, provided in part: "When the allowed period is less than seven days, intermediate Sundays and legal holidays, if any, shall be excluded in the computation."

In determining whether the five-days requirement of Rule 30.12 was met, the day of filing (August 7), Sunday (August 12), and the trial setting date (August 13) are not counted. Defendant's affidavit to disqualify Judge Crow was not timely filed. *State v. Lue*, 598 S.W.2d 133, 136[1] (Mo. banc 1980).

It is unnecessary to determine whether Judge Crow effectively ruled on the motion before the affidavit was filed. Defendant's affidavit, being untimely, did not have the automatic effect of disqualifying Judge Crow, *State v. Light*, 484 S.W.2d 275 (Mo.1972); *State v. Thompson*, 472 S.W.2d 351, 353[1] (Mo.1971); *State v. Crow*, 388 S.W.2d 817, 822[13] (Mo.1965), and thus its filing was no bar to Judge Crow's ruling upon the motion to suppress. Indeed there are civil cases, under similar rules concerning disqualification of judges, to the effect that a *timely* affidavit of disqualification does not interfere with the power of the disqualified judge to rule upon motions argued and submitted to him prior to the filing of the application. *Jenkins v. Andrews*, 526 S.W.2d 369, 373 (Mo.App. 1975); *Natural Bridge Development Co. v. St. Louis County Water Co.*, 563 S.W.2d 522, 526[4, 5] (Mo.App.1978).

Defendant has not challenged the propriety of Judge Crow's order transferring the cause to another division. At least in the absence of such objection, it was not error for Judge Crow to sustain the untimely application. *State v. Euell*, 583 S.W.2d 173, 174[1, 2] (Mo. banc 1979); see also *State v. Tyler*, 587 S.W.2d 918, 929[23, 24] (Mo.App.1979).

Defendant's first point has no merit.

Defendant's second point is that the trial court erred in denying defendant's motion for a mistrial arising out of testimony of state's witnesses Jacobs and Jennings to the effect that the check involved in the instant offense was "stolen." It is defendant's position that the challenged testimony was inadmissible under the general rule, stated in *State v. Tillman*, 454 S.W.2d 923, 926 (Mo.1970), "that evidence that accused has committed another crime independent of, and unconnected with, the one on trial is inadmissible; it is not competent to prove one crime by proving another." It is unnecessary to determine whether the testimony was admissible under any of the exceptions to the general rule.

The state's evidence entitled the jury to find that on July 22, 1977, defendant went to the K-Mart store in Springfield. Susan Jacobs, a store employee, was on duty at the service desk. Defendant presented Mrs. Jacobs with a "bonded" payroll check which was drawn on the First National Bank of Pierce City, Missouri, and which bore the purported signature of Bill Kahre. The check, dated July 22, 1977, was made payable to Steve Bass and was in the amount of $169.43.

Mrs. Jacobs was the first witness called by the state. During her testimony the following occurred:

"Q. (By prosecutor) Now, once again directing your attention to that occasion, what if anything occurred which later turned out to be unusual on that occasion—

"A. Yes.

"Q. And what was that?

"A. I took—I cashed a check that later turned out to be stolen."

Defense counsel made an objection, on the basis of the rule in *Tillman*, and asked the court to strike the answer or to declare a mistrial. The court informed the jury that the answer was stricken and instructed the jury to disregard it.

During the testimony of Dale Jennings, another store employee, the following occurred:

"Q. (By prosecutor) And on that occasion, what if anything unusual occurred.

"A. Well, we later found it was—we later learned and found out it was a stolen and forged check."

At that point defendant's attorney made a general objection which the court sustained. The court instructed the jury to disregard the question and the answer and ordered the testimony stricken.

The following then occurred:

"Q. (By prosecutor) Now, was there anything unusual that occurred on that occasion that later—was there anything that occurred on that occasion that later turned out to be unusual?

"A. Yes, sir. There was a check passed.

"Q. And what did you later find out about that check?

"A. The check was a stolen and forged instrument.

"MRS. CRIST-BROWN: Your Honor, I object and ask for a mistrial."

A conference was then held at the bench, out of the hearing of the jury. Defendant's attorney stated, "I object and ask for a mistrial, or in the alternative that this be ordered stricken from the record and the jury asked to disregard it." Following the conference the court told the jury, "The last question was quite improper, I am ordering it stricken and please disregard it."

Also testifying for the state were Bill Kahre, his wife Agnes and their son Steve. Bill Kahre testified that he and his wife operated a plant near Pierce City under the name of "Kahre & Sons Slaughtering & Processing." The check, state's Exhibit 1, which defendant presented to Mrs. Jacobs was identified by Bill Kahre as "our check." He also stated that he did not sign the check, although it purported to bear his signature, and that only he and his wife were authorized to sign the check.

Agnes Kahre identified Exhibit 1 as being "our business check." She stated that she and her husband were the only two people authorized to sign the checks and that she had not placed her husband's signature on the exhibit. Steve Kahre testified that he was the manager of the slaughtering plant on July 22, 1977, that he had no authority to sign the check, and that he had not placed his father's signature on Exhibit 1.

The testimony of Mr. and Mrs. Kahre and their son, to which defendant made no objection, justified the jury in finding that the signature on Exhibit 1 was a forgery. Their testimony, if believed, would support, and perhaps compel, an in-ference that the check, before being forged, had been stolen.

A forged check has no value as a chose in action and if there was a theft of the check the only thing stolen was a piece of paper having little, if any, intrinsic value. If it is an offense to steal a blank check [1] it is certainly not, standing alone, the type of theft likely to inflame a jury.

The testimony of the two witnesses with respect to the stolen character of the check was essentially volunteered rather than solicited by the prosecutor. Neither Jacobs nor Jennings testified that the check was stolen by defendant. The court ordered the testimony stricken and it is at least arguable that the defendant abandoned his request for a mistrial by later requesting the alternative relief of an order to disregard, and that order was given.

"It is within the trial court's province to determine the prejudicial effect of a volunteered improper remark by a witness . . as the trial court is in the best position to judge the effect of the remarks. . . . The granting of a mistrial is a drastic remedy which should be used only in extraordinary circumstances when the incident is so grievous that its prejudicial effect can be removed in no other way. . . . And the role of an appellate court is to determine whether the trial court abused its discretion in refusing to grant a mistrial. . . ." *State v. Hoyel*, 534 S.W.2d 266, 270[8–11] (Mo.App.1975). (Citing authorities.)

Making the charitable assumption that the request for mistrial was timely, adequate, and not abandoned, this court holds that the trial court did not abuse its discretion in denying that request.

Defendant's second point has no merit.

---

1. Depending, of course, on the language of the particular larceny statute involved, some authorities have held that a blank check may be the subject of larceny. *Keller v. U. S.*, 168 F. 697 (7th Cir. 1909); *State v. Alden*, 8 Or.App. 519, 495 P.2d 302, 303[4] (1972).

In *State v. Murphy*, 141 Mo. 267, 42 S.W. 936 (1897), the dividing line between grand and petit larceny was $30. The charge was larceny of $29.35 in cash and a check alleged to be worth $1.35. The court said: "In the absence of proof that the check was drawn upon some particular bank or banking house in favor of some person named in the check, or to bearer, and signed by the person by whom drawn, it was no more than a blank piece of paper, and of no actual value, and evidence that it was of the value of $1.35, without more, was entitled to no consideration."

Defendant's third point is that the trial court erred in denying "defendant's motion to suppress in-court identification of defendant and in allowing in-court identification of defendant by state's witnesses Jacobs, Peterson and Jennings for the reason that a pretrial photographic display to said witnesses was suggestive in its method, thus causing a substantial likelihood of irreparable misidentification."

As the excellent brief of the state points out, the point fails to state "wherein and why" the photographic display was "suggestive." In so doing it fails to comply with Rule 84.04(d) V.A.M.R. A point somewhat similarly stated has been held to violate the rule. *State v. Morgan*, 593 S.W.2d 256, 258[1, 2] (Mo.App.1980). In *Morgan* the defectively stated point was considered on its merits. Although repeating the warning of *Morgan*, this court concludes to review defendant's third point.

In *State v. Higgins*, 592 S.W.2d 151, 159 (Mo. banc 1979), the court dealt with the use of photographs as an aid to identification or release of suspects in police investigatory procedures. The following principles were enunciated: The danger to be guarded against is that the photographic identification procedure will be so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Whether this danger exists in a particular case depends on the totality of the surrounding circumstances. The resolution of this issue requires a two-step analysis: (1) Were the investigative procedures employed by the police impermissibly suggestive? and (2) If so, were they so impermissibly suggestive as to create a very substantial likelihood of an irreparable misidentification at trial?

At p. 160 the court said: "Reliability, not suggestiveness, 'is the linchpin in determining the admissibility of identification testimony . . .' and reliability of the in-court identification testimony is to be assessed under the 'totality of the circumstances.' . . . Factors to be considered include: (1) The opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation."

The photographic display, challenged by defendant's motion to suppress, took place at the Springfield police station on July 29, 1977, one week after the commission of the offense. Three employees of K-Mart, Victor Peterson, Susan Jacobs, and Dale Jennings, went to the police station where an examination of the photographs took place under the direction of Detective Tony Glenn. A set of six photographs was shown to Mrs. Jacobs. After she had looked at them and had told Glenn, in the presence of the other two witnesses, that one photograph was that of the check passer, Glenn shuffled the photographs and handed them to Peterson. After inspecting them, Peterson told Glenn that he, too, recognized one photograph as being that of the check passer. The photographs were again shuffled by Glenn and handed to Jennings. Jennings, too, reached his independent conclusion that one of the photographs was that of the culprit. Each of the witnesses indicated to Glenn the photograph that the witness had selected. Each witness, when doing so, did not yet know that his selection was also that of the other two. After that was done the three witnesses signed the back of the photograph they had independently selected.

Defendant's motion to suppress, in purporting to set forth the manner in which the viewing of the photographs was impermissibly suggestive, stated: "The photograph of the defendant was the only one of the six photographs shown to the witnesses which resembled the description given by the witnesses prior to the photographs being shown."[2] Although the six photographs

---

**2.** The motion also alleged that on a date subsequent to the July 29 viewing of the photographs, "defendant was pointed out to the witnesses by a member of the prosecution staff of

used in the display are a part of the instant record and have been examined by this court, defendant's brief makes no attempt to advance this alleged ground and indeed makes no mention of it.

As earlier stated, defendant's third point does not set forth in what manner the photographic display was allegedly impermissibly suggestive and the argument portion of the brief is only a little more informative. Defendant's brief concedes that each of the three witnesses made an independent selection of one photograph. The brief quotes a portion of the testimony of Mrs. Jacobs and characterizes it as being "most revealing." That testimony is as follows:

"THE COURT: Were those gentlemen watching you when you pointed out the picture?

"MRS. JACOBS: No. We all—I said this one and then the detective—Peterson said, 'I agree.' And then Mr. Jennings said, 'Yeah, that's the one.'"

The foregoing testimony must not be viewed out of context. The testimony of Mrs. Jacobs, and that of the other two witnesses, was to the effect that each made his own selection before becoming aware of the photograph selected by the other two. Among the findings of the trial court, with respect to the motion to suppress, is the following: "All three of the witnesses, Peterson, Jacobs, and Jennings, had each in their own mind identified the photograph of defendant prior to the time that any of those witnesses indicated to the other that such witness had identified the photograph of the defendant." That finding is supported by the record and defendant has not attacked it.

Defendant's assertion that the photographic display was "impermissibly suggestive" has no factual foundation. That be-

ing the situation, there is substantial authority to the effect that it is not necessary to proceed to the second step of the two-step analysis set forth in *Higgins*, supra. *Fillippini v. Ristaino*, 585 F.2d 1163, 1168 (1st Cir. 1978); *Williams v. McKenzie*, 576 F.2d 566, 571 (4th Cir. 1978).

Moreover, even if the photographic display was impermissibly suggestive, that alone would not constitute a denial of due process. *United States v. Bierey*, 588 F.2d 620, 625[8] (8th Cir. 1978). If there exists an independent source of identification, that source "will serve to remove any taint that might result from a suggestive confrontation." *State v. Davis*, 529 S.W.2d 10, 14 (Mo.App.1975). See also *State v. Morgan*, 593 S.W.2d 256, 258 (Mo.App.1980).

In *Higgins* the court found that the photographic display was not impermissibly suggestive. Proceeding on the assumption, however, that the display was impermissibly suggestive, the court in *Higgins* considered the five factors[3] earlier enumerated to assess the reliability of the in-court identification testimony under the "totality of circumstances." Application of those factors to the instant record demonstrates that the ruling of the trial court may be justified on the ground of the existence of an independent source of identification.

During the check passing incident Mrs. Jacobs observed the defendant "for about 10 or 15 minutes," while the defendant was "about a foot away." Peterson and Jennings observed the defendant from a "security window" in the store. Their position was approximately 120 feet away from the defendant but each witness used his own set of binoculars to observe him. Peterson watched him for "the majority of 10 minutes." Jennings watched the defendant, initially, for "10 seconds, possibly 20

---

Lawrence County, Missouri, as being the accused." Defendant's brief makes no mention of this event and the state's evidence was to the effect that no such "pointing out" took place.

**3.** The five factors enumerated in *Higgins* were enunciated in *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972).

The fifth factor is "the length of time between the crime and the confrontation." As there used, "confrontation" refers to that taking place at the pretrial identification procedure rather than to the confrontation at the trial itself. See *Manson v. Brathwaite*, 432 U.S. 98, 115 116, 97 S.Ct. 2243, 2253 2254, 53 L.Ed.2d 140 (1977).

seconds." Jennings also watched the defendant again for an unspecified length of time. All three witnesses paid a high degree of attention to defendant during their observation of him and they provided the police with reasonably accurate and detailed descriptions of the check passer. At the photographic display and at the trial itself each witness made an unequivocal identification of defendant. The length of time between the offense and the pretrial identification of defendant was one week. Under the "totality of circumstances" the in-court identification of defendant by the three witnesses was reliable.

Defendant's third point has no merit.

The judgment is affirmed.

TITUS, GREENE and PREWITT, JJ., concur.