STATE of Missouri, Respondent,

v.

Bruce A. CHARLES, Appellant.

No. KCD 28348.

Missouri Court of Appeals, Kansas City District.

Oct. 12, 1976.

Thomas M. Larson, Public Defender, Lee M. Nation, Asst. Public Defender, Sixteenth Judicial Cir., Kansas City, for appellant.

Bruce Charles, pro se.

John C. Danforth, Atty. Gen., Christopher R. Brewster, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., and SWOFFORD and SOMERVILLE, JJ.

SOMERVILLE, Judge.

Appellant was tried as a second offender for the crime of robbery in the first degree by means of a dangerous and deadly weapon. The jury returned a verdict finding appellant guilty and the court assessed his punishment at confinement in the Missouri Department of Corrections for twenty-five years. Sections 556.280, 560.120, and 560.-135, RSMo 1969.

There are two specifications of error on appeal: (1) the trial court erred in overruling appellant's motion to suppress "identification evidence as said evidence was the result of constitutionally impermissible and unduly suggestive police procedures"; and (2) the trial court erred in refusing to grant a mistrial when one of the state's witnesses "commented" on defendant's "arrest for another robbery insofar as this statement presented evidence of another crime, was irrelevant, and prejudicial." The specifications do not lend themselves to being quickly or easily disposed of because of the facts in which they are immersed.

The sufficiency of the evidence to support the verdict has not been challenged by appellant. A statement of the facts demonstrates why appellant chose not to do so.

On February 9, 1975, at approximately three o'clock in the afternoon, two black males, each wielding a handgun, entered a Revco Drug Store at 3501 Broadway, Kansas City, Missouri, and, at gunpoint, stole and took assorted drugs and narcotics, and $3,400.00 in checks, cash and loose change which was the property of said store and in the care and custody of one of its employees. Various customers in the store at the time, as well as the store's employees, were also robbed of certain personal effects.

There was a marked difference between the sizes of the two black males. One was approximately five feet nine inches in height and weighed approximately one hundred and fifty pounds. The other was approximately six feet one or two inches in height and weighed approximately one hundred and ninety pounds.

The smaller of the two men proceeded to the pharmacy area of the store and at gunpoint relieved Bill Bond, the assistant manager and pharmacist, of the money and property heretofore mentioned. The larger of the two men, at gunpoint, herded Ron Lopez, an employee of the store, and customers who were in the store, into a storage room at the rear of the premises. In a short time Bill Bond joined the group in the storage room. The larger of the two men then told the group in the storage room, " . . . you guys are going to have to give us ten minutes . . . and I'll kill the first person that walks out of that door."

Temporally speaking, the robbery took place over a span of approximately ten minutes. Bill Bond, who bore the brunt of the activities of the smaller of the two black males during the robbery, although able to identify the smaller of the two men, was unable to identify the larger of the two men. Ron Lopez, who bore the brunt of the activities of the larger of the two black males during the robbery, although unable to identify the smaller of the two men, identified appellant as the person described as the larger of the two men.

The identification of appellant, in the context of his specification of error, requires a look at certain facts brought out at the hearing on appellant's motion to suppress. Immediately after the robbery Ron Lopez was shown an array of twenty or thirty photographs of unidentified persons by the police. He was unable to pick out either of the perpetrators of the robbery from them. A week later he was shown a different array consisting of approximately twenty photographs of unidentified persons. Again he was unable to identify any of them as depicting any person connected with the robbery. On February 21, 1975, eleven days after the robbery, Bill Bond told Ron Lopez that he saw a television news clip of three suspects who had been arrested in connection with the robbery of another Revco Drug Store and recognized one of the suspects as being one of the two men who robbed their store on February 9, 1975. Bond passed this information onto the police department and, as a result, a detective visited Bond and Lopez and, out of the presence of each other, separately displayed to each an array of six photographs of unidentified persons. Bond identified one of the six photographs as being a picture of the smaller of the two men who robbed the Revco Drug Store at 3501 Broadway on February 9, 1975. However, Bond was unable to identify the larger of the two men who committed the robbery in question from the photographs. Lopez identified one of the six photographs as depicting the larger of the two men who committed the robbery, to-wit, the appellant, but was unable to identify the smaller of the two men. The detective who presented the photographs made no physical or oral suggestions of any kind to Lopez before or during the time he studied the six photographs and ultimately identified appellant. There is nothing in the record to suggest that the six photographs were per se suggestive. Lopez, after identifying appellant from one of the six photographs, learned for the first time that three of the six photographs were pictures of the three men shown in the television news clip as suspects in the other Revco Drug Store robbery. Lopez had not seen the television

news clip. There is not one scintilla of hard evidence that Lopez knew, prior to or during his examination of the six photographs and his selection of one as the picture of appellant, that three of the six photographs were pictures of the three suspects arrested in connection with the other robbery. Even though Lopez, based on what Bond had said, might have inferred that three of the six photographs were pictures of the three suspects in the other robbery, there was no way for Lopez to know which three of the six photographs were pictures of said suspects because he had not seen the television news clip. During the hearing on the motion to suppress, Lopez was asked on cross-examination why he had picked defendant's picture out of the six photographs displayed to him on the last occasion. He replied: "It just looked like the same man is all, that's all I can say. The face looked exactly like him, not the clothing or anything, just the face."

During the trial, which commenced on September 24, 1975, the state relied upon Lopez's positive in-court identification of appellant as being one of the two black males who robbed the Revco Drug Store on February 9, 1975. The following facts gave verity to and constituted an independent basis for Lopez's positive in-court identification of appellant. The robbery spanned a period of ten minutes. It occurred during daylight hours and there is nothing in the record to indicate that light conditions in the store were inadequate. During the course of the robbery Lopez had three face-to-face confrontations with the appellant, one when they were six or seven feet apart, another when they were two or three feet apart, and still another when they were in close proximity in the storage room at the rear of the store.

■ Resolution of appellant's first specification of error lies in a principle (or test) enunciated by the Supreme Court of the United States in *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968): " . . . convictions

based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was *so* impermissibly suggestive as to give rise to a *very substantial likelihood* of irreparable misidentification." (Emphasis added.) As noted in *State v. Parker*, 458 S.W.2d 241 (Mo.1970), and, as well, in many subsequent cases in this state at the appellate level, this state has acceded to and followed the principle (or test) laid down in *Simmons*. As carefully pointed out in *Simmons*, each case "must be considered on its own facts" [1] and "evaluated in light of the totality of surrounding circumstances." [2]

The ultimate issue is multi-faceted. Was the pretrial photographic identification procedure "impermissibly suggestive"? If so, was it "so impermissibly suggestive" that there is a "very substantial likelihood" that the in-court identification which followed in its wake was an "irreparable misidentification"?

Frankly, this court, notwithstanding appellant's argument, entertains serious doubts as to whether the pretrial photographic identification procedure can be legally branded as "impermissibly suggestive". A thin inference, resting solely on Bond's statement to Lopez that he recognized one of the robbers on a television news clip showing three suspects who had been arrested in connection with a robbery that occurred at another Revco Drug Store, is all there is that even remotely smacks of suggestiveness. Serving to offset this attenuated inference stands undisputed evidence that Lopez did not see the television clip and did not know, until after making the identification, that photographs of the three suspects shown therein were among the six photographs presented to him.

■ Assuming, arguendo, that the pretrial photographic identification procedure was "suggestive", there is an abundance of evidence that it was not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentifica-

---

**1.** 390 U.S., at 384, 88 S.Ct., at 971.

**2.** 390 U.S., at 383, 88 S.Ct., at 970.

tion." Weighed in light of the "totality of surrounding circumstances", *Simmons*, supra, this court concludes that the positive in-court identification of appellant by Lopez during the trial was based on a definite image of appellant in Lopez's mind, the acquisition and existence of which preceded the pretrial photographic identification which appellant argues was maculated. This conclusion is argued by the following facts: (1) Lopez had three face-to-face confrontations with appellant during the ten minute course of the robbery; (2) the confrontations were at close range, occurred during the middle of the afternoon, and were more than fleeting in nature; (3) Lopez was seemingly unsusceptible to suggestion as evidenced by the fact that he rejected some forty or fifty photographs before picking appellant's picture from the six photographs presented to him on the last occasion; and (4) as Lopez testified on cross-examination during the pretrial hearing to suppress, he picked the photograph he identified as being that of the appellant because it "looked like" the larger of the two men who committed the robbery, the "face looked exactly like him, not the clothing or anything, just the face."

Appellant's remaining specification of error involves certain testimony before the jury by state's witness Bill Bond concerning the circumstances which led to appellant's identification. The state in its opening statement advised the jury that "Bill Bond was watching television and he saw the people on television that he though had robbed him." With this prelude in mind, the following questions were asked Bill Bond by the state, to which he gave the following answers:

"Q. Before they came out the last time and you tentatively identified one man and positively another, you had called the police?

A. (Witness nods) There again—

Q. Just answer the question so we can proceed in an orderly fashion.

A. I'm not sure whether I called them or they called me. Had they not called me, I would have called them. I don't remember whether they called me or I called them.

Q. What was the occasion for your calling them?

A. Well, because I seen on the news of another holdup and . . . ."

The witness' last answer was interrupted by an objection lodged by defense counsel. The trial court sustained the objection and defense counsel moved for a mistrial. The trial court refused to declare a mistrial, whereupon defense counsel asked the trial court to instruct the jury to "disregard" witness Bond's last answer, and the trial court so instructed the jury. The state's attorney, outside the presence of the jury, advised the trial court that Bill Bond had been cautioned before he went on the stand to avoid any mention of another robbery in connection with what he had seen on television. Appellant apparently accepted this explanation because he does not contend that Bond's controversial answer was elicited by design on the part of the state. In all candor, this court is somewhat perplexed as to why the state ever opened up the subject matter which eventually culminated in the objected to answer volunteered by state's witness Bill Bond.

Appellant contends that the objected to answer of Bill Bond, when viewed in conjunction with the remark made during the state's opening statement, reasonably inferred that appellant had been involved in a crime unrelated to the one for which he was standing trial. It is axiomatic that under the law of this state the general rule is that evidence of a separate and distinct crime other than the one for which an accused is standing trial is inadmissible. *State v. Griffin*, 336 S.W.2d 364 (Mo.1960); and *State v. Summers*, 362 S.W.2d 537 (Mo. 1962). This general rule, like many others, did not evolve without the engraftment of certain exceptions. See: *State v. Reese*, 364 Mo. 1221, 274 S.W.2d 304 (banc 1954), and *State v. Smith*, 431 S.W.2d 74 (Mo. 1968). The state does not attempt to validate Bond's answer on the basis that it falls within the perimeter of a recognized exception.

Any nexus between Bond's answer and appellant's involvement in another robbery is tenuous at best, because, if for no other reason, Bond consistently testified that he was unable to identify appellant as one of the two men who perpetrated the robbery on February 9, 1975, at the store where he was employed. In view of Bond's inability to identify appellant, it seems highly doubtful that the jury drew the adverse inference urged by appellant.

If the jury did not infer that appellant had been involved in the other robbery, then it is difficult to see how Bond's unsolicited statement could be said to have prejudiced appellant in any real sense. If the jury drew the inference advanced by appellant, then the apical issue can be framed by the following question. Was the prejudicial effect of Bond's statement cured by the trial court's sustention of the objection and its instruction to the jury to disregard the statement, or was the statement so heavily weighted with prejudice that nothing short of declaring a mistrial could cure it?

 The declaration of a mistrial is a drastic remedy and should not be resorted to except in those extraordinary situations where prejudice cannot be removed by other means. *State v. James*, 347 S.W.2d 211, 224 (Mo.1961); *State v. Johnson*, 496 S.W.2d 852, 857–58 (Mo.1973). By its very nature a decision to grant or deny a request for a mistrial rests uniquely within the discretion of the trial court because of its superior vantage point from which to assess the pervasive effect of a prejudicial statement and whether it can be dissipated by timely and appropriate action short of declaring a mistrial. Recognizing the superior vantage point possessed by trial courts to assess prejudice and the level of action required to eradicate it, appellate courts are properly hesitant to hold that a trial court committed error in refusing to grant a mistrial and do so only when convinced that the trial court "as a matter of law" abused its discretion in refusing to do so. *State v. Parker*, 476 S.W.2d 513, 516 (Mo.1972); *State v. Ward*, 457 S.W.2d 701, 709 (Mo.1970), and *State v. Smith*, supra, at 83.

*State v. Parker*, 476 S.W.2d 513 (Mo. 1972), supra, is particularly apropos to appellant's final specification of error. In *Parker*, the defendant was tried and convicted of burglary and stealing. During trial a police officer testified that when defendant was arrested "a weapon was found in the vehicle". Another witness testified that he went to the Jackson County Jail "where the subject was being held for other charges". Both statements were objected to and the respective objections were sustained. No request was made by defense counsel to have the jury instructed to disregard the objectionable statements. Instead, he limited the relief sought to requests for declaration of a mistrial, which in both instances were denied. On appeal defendant's contention that the trial court committed error in failing to declare a mistrial was rejected. The court held, l.c. 516: " . . . The remarks objected to were volunteered by the witnesses. Errors of this nature cannot always be avoided, but when they do occur it is the duty of the trial court, who has observed the incident and is in a better position than an appellate court to evaluate the prejudicial effect, if any, to determine the possibility of its removal by action short of a mistrial. In this respect the trial court necessarily must be vested with broad discretion. In the exercise of that discretion, the trial court concluded that in this case a mistrial was not required. . . . The function of an appellate court is to determine whether as a matter of law the trial court abused its discretion in refusing a mistrial. We rule that it did not." *State v. Valentine*, 490 S.W.2d 290, 292 (Mo.App.1973) is in the same vein and equally persuasive.

 This court concludes that Bond's unprompted statement, even if the jury spun the nebulous inference urged by appellant, was not so indelibly prejudicial that it could not be erased from the minds of the jurors by the trial court's instruction to them to disregard the statement.

Judgment affirmed.

All concur.