**STATE of Missouri, Respondent–Appellant,**

v.

**Darrell E. ISAIAH, Appellant–Respondent.**

Nos. WD 44366, WD 46705.

Missouri Court of Appeals,
Western District.

Feb. 22, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 29, 1994.

Application to Transfer Denied
May 26, 1994.

Ellen H. Flottman, Office of the State Public Defender, Columbia, for appellant-respondent.

Jeremiah W. (Jay) Nixon, Atty. Gen., Rudolph R. Rhodes, Asst. Atty. Gen., Jefferson City, for respondent-appellant.

Before BERREY, P.J., and BRECKENRIDGE and HANNA, JJ.

BRECKENRIDGE, Judge.

This action involves consolidated appeals. Following a jury trial, Darrell Isaiah was convicted of first degree murder, § 565.020.1, RSMo 1986, and armed criminal action, § 571.015, RSMo 1986, and sentenced to life imprisonment without possibility of probation or parole on the murder charge and twenty years imprisonment on the armed criminal action charge. Isaiah subsequently appealed from the judgment of conviction. He also filed a motion for post-conviction relief pursuant to Rule 29.15. The motion court sustained his 29.15 motion, setting aside the judgment and sentences and granting a new trial based on findings of ineffective assistance of counsel. The State filed a motion for rehearing which was denied. On August 2, 1992, the State filed an appeal from the motion court's judgment setting aside the convictions. The judgment of the trial court is affirmed. The judgment of the motion court is reversed and remanded.

Vanessa and Darrell Isaiah had been married for seven years at the time of Vanessa's death in October 1989. The record reveals that the couple had been having marital difficulties for some time and Vanessa had recently moved in with her mother Etoy Jones. On October 16, 1989, Vanessa obtained an ex parte order of protection against Darrell from the Jackson County Circuit Court. On October 23, 1989, at approximately 5:00 p.m., Vanessa called her mother to pick her up from work. When Jones arrived at Vanessa's place of employment, Vanessa was standing in a doorway near a security guard stand.

At that time, Jones noticed Darrell's gray Oldsmobile parked down the street. Jones proceeded to drive around the block and did not see Darrell's vehicle when she returned to pick up Vanessa. When Vanessa entered her mother's car, she asked about Darrell's whereabouts. Her mother indicated that she thought Darrell had left. Vanessa then returned to her workplace to call the police. After a few minutes, Vanessa returned to the car and Jones began the drive home. After Jones had driven approximately two blocks, she noticed Darrell's gray Oldsmobile approaching behind her. When Jones stopped her car at a stoplight, Darrell pulled his vehicle alongside her car and told Vanessa that he wanted to talk to her. Vanessa turned to her mother and told her that Darrell had a gun and that "he's going to shoot us." At that point, Darrell fired two shots into Jones' car, one of the shots hitting Jones in her upper right back.

When the light changed, Jones was unable to drive because her right side felt paralyzed. Vanessa put her foot on the gas pedal while Jones turned the steering wheel as they attempted to drive away but the car was swerving out of control. When Jones' vehicle came to a stop, Vanessa reached over and turned off the ignition. Darrell pulled his car up on the shoulder of the road next to the Jones vehicle and got out of his car. He approached the Jones vehicle and fired four shots at Vanessa. Immediately thereafter, Darrell returned to his car and drove away. Witnesses notified the police. When officers arrived on the scene, Jones told them that "Darrell Isaiah shot us." Vanessa and her mother were subsequently taken to the hospital. Jones survived but Vanessa died of multiple gunshot wounds.

At approximately 10:00 p.m. that evening, the police officers investigating the shooting were notified that Darrell had gone to the police station. Officers Steven Shaffer and Detective Albert DeValkenaere went to the station to meet with Darrell. At the station, Darrell told police that someone had called him to inform him that his wife had been shot and he wanted to meet with police to "clear his name." Darrell was subsequently arrested and charged with one count of first

degree murder, one count of first degree assault and two counts of armed criminal action.

Following a jury trial, Isaiah was found guilty of the first degree murder charge and one count of armed criminal action. He was sentenced to life imprisonment without possibility of parole or probation on the first degree murder count and twenty years imprisonment on the armed criminal action count. On January 17, 1991, Isaiah filed his notice of appeal. He subsequently filed a motion for post-conviction relief pursuant to Rule 29.15 which was sustained by the motion court, setting aside the judgment and convictions and granting a new trial. The State appeals from that judgment.

## The 29.15 Proceedings

The State appeals from the motion court's judgment setting aside the convictions and sentences on the basis that the judge should have recused himself from the post-conviction proceeding because he was biased.

A preliminary procedural issue before this court is whether Isaiah's first and second amended motions were properly before the motion court due to untimeliness and lack of verification.[1] Because of the dispositive nature of the procedural issue, this court will not reach the merits of the State's claim as to whether the motion judge was biased.

■ The record shows that following his conviction for first degree murder and armed criminal action, Isaiah filed a pro se motion for post-conviction relief pursuant to Rule 29.15 on August 7, 1991. On August 12, 1991, the Office of the Jackson County Appellate Defender was appointed to represent Isaiah in his motion for post-conviction relief. Counsel entered her appearance on August 14, 1991 and was granted a thirty-day extension to file an amended motion. Pursuant to

Rule 29.15(f), Isaiah had a maximum of sixty days from the date of appointment of counsel within which to file an amended motion.[2] As such, the amended motion would have been due on October 11, 1991. However, the first amended motion was not filed until October 18, 1991, several days beyond the deadline.

On December 12, 1991, appointed counsel was granted leave to withdraw from the case apparently due to a conflict of interest. As a result of the withdrawal of Isaiah's first motion counsel, the court transferred the case to the Office of the Appellate Defender, Central District, in Columbia, Missouri, to act as appointed counsel for Isaiah.[3] The motion court allowed counsel thirty additional days from the date of the order for filing the amended post-conviction motion. Another thirty-day extension was granted on January 7, 1992. The court allowed counsel until February 10, 1992 to file the motion. An unverified, second amended motion was filed on February 7, 1992.

Following an evidentiary hearing in March 1992, the motion court granted relief based on findings of ineffective assistance of counsel. Most of the court's findings were based on the new allegations raised in the second amended motion.

■ Rule 29.15(f) provides, in pertinent part:

> Any amended motion shall be verified by movant and shall be filed within thirty days of the date counsel is appointed or the entry of appearance by counsel that is not appointed. The court may extend the time for filing the amended motion for one additional period not to exceed thirty days.

It is well-settled that the time limitations set forth in the rules governing post-conviction relief are reasonable and mandatory. *State v. Ervin*, 835 S.W.2d 905, 929 (Mo. banc 1992), *cert. denied*, — U.S. —, 113 S.Ct.

---

1. The lack of verification pertains only to the second amended post-conviction motion filed in February 1992.

2. The time limitations set forth in Rule 29.15(f) begin to run from the earlier of the date counsel is appointed or the date of entry of appearance by non-appointed counsel. *State v. Barton*, 792 S.W.2d 663, 666 (Mo.App.1990).

3. The record reflects that the appointed counsel from the Central Appellate Division withdrew from the case in January 1992. The attorney that ultimately filed the second amended motion in February 1992 was appointed by the State Public Defender's office and entered an appearance on January 3, 1992. There is no indication or explanation in the record, however, as to the reason for the substitution of counsel.

1368, 122 L.Ed.2d 746 (1993). The time limitations of Rule 29.15 "serve the legitimate end of avoiding delay in the processing of prisoner claims." *Id.* The maximum time allowed to file an amended motion under Rule 29.15(f) is sixty days from the date counsel is appointed. The motion court does not have discretion to grant extensions beyond the time limits set forth in the rule. *State v. Six,* 805 S.W.2d 159, 170 (Mo. banc 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991). Moreover, the transfer of a post-conviction case from one public defender's office to another due to a conflict of interest does not affect the time limits for filing an amended motion. *State v. Hill,* 808 S.W.2d 882, 893 (Mo.App.1991).

 Missouri courts have traditionally held that an untimely amended post-conviction motion amounts to a complete procedural waiver of all new grounds raised in the motion. *State v. Leisure,* 810 S.W.2d 560, 575 (Mo.App.1991). In recent years, however, the Missouri Supreme Court has deviated from this strict procedural standard in recognizing an exception in cases where defendants have been completely "abandoned" by post-conviction counsel. *Luleff v. State,* 807 S.W.2d 495 (Mo. banc 1991); *Sanders v. State,* 807 S.W.2d 493 (Mo. banc 1991). Failure to file a timely amended motion has been held to constitute a form of "abandonment" by post-conviction counsel. *Sanders,* 807 S.W.2d at 494–95. The proper procedure set forth in *Luleff* and *Sanders* is to remand the case to the motion court for a factual determination as to the reason for the untimeliness. *Luleff,* 807 S.W.2d at 497; *Sanders,* 807 S.W.2d at 495. On remand, the movant has the burden of demonstrating that the "untimeliness is not the result of negligence or intentional conduct of the movant, but is due to counsel's failure to comply with Rule 29.15(f)." *Sanders,* 807 S.W.2d at 495. If the motion court determines that the untimeliness is the movant's fault, the court shall not permit the filing of the amended motion. *Id.* However, if the court determines the untimeliness was a result of the inattention of post-conviction counsel, the court shall permit the filing of the amended motion. *Id.*

In the present case, the first motion counsel had sixty days to file an amended motion but did not file it until several days after the deadline. Although the record reflects that Isaiah's first motion counsel withdrew after filing the amended motion, there are no findings in the record to indicate the reason for the untimeliness.

 The second amended motion was filed nearly six months after Isaiah filed his pro se motion and three and one-half months after the first amended motion was filed. After the filing of an amended motion, a movant cannot successfully claim abandonment with respect to the late filing of a second amended motion. *See, e.g., Brownlow v. State,* 818 S.W.2d 302, 307 (Mo.App.1991). The time limitations set forth in Rule 29.15 serve the legitimate purpose of avoiding delay in the processing of post-conviction claims. *Ervin,* 835 S.W.2d at 929. Here, the motion court exceeded the authority of Rule 29.15 by granting additional extensions which resulted in a delay of several months. As such, this court finds the second amended motion untimely.

 Even assuming, *arguendo,* that the second amended motion had been timely filed, there is no indication in the record that it was either signed or verified by Isaiah. Failure to verify an amended motion constitutes a jurisdictional defect. *Leisure,* 810 S.W.2d at 576. An amended motion that is not verified is a legal nullity which fails to invoke the jurisdiction of the motion court. *State v. Vinson,* 800 S.W.2d 444, 447 (Mo. banc 1990).

 Without a finding that the first amended motion was untimely due to no fault of Isaiah, the motion court was without jurisdiction to consider any new allegations contained in the first amended motion. The motion court was also without jurisdiction to consider any new allegations contained in the second amended motion because it was both untimely and unverified. Notwithstanding, the motion court afforded Isaiah an evidentiary hearing and considered the merits of the claims presented in those motions.[4] The

---

4. The motion court also heard evidence pertaining to some of the original allegations raised in the pro se motion which were realleged in the second amended motion.

judgment of the motion court must be reversed.

In view of the foregoing, this cause is remanded to the motion court for a determination as to the cause of the untimely first amended motion. If the trial court determines that the untimeliness was not the result of negligence or intentional conduct of Isaiah and that Isaiah was abandoned by his post-conviction counsel, the court shall permit the filing of the first amended motion and proceed thereon.

 The State's claim that the motion judge is biased can be raised upon remand to the motion court. Upon remand of a suit, a party is generally entitled under Rule 51.05 to have a new judge without cause. *Hough v. Hough,* 819 S.W.2d 751, 752 (Mo.App. 1991). In *Thomas v. State,* 808 S.W.2d 364, 367 (Mo. banc 1991), however, the Supreme Court held that Rule 51.05 does not apply to a motion for post-conviction relief. A movant is not entitled to a change of judge without cause. *Id.* Such a holding does not leave a movant who faces a biased judge with no relief, because due process commands that a movant facing a prejudiced trial court be entitled to disqualify the judge. *Id.* Section 508.090 contains the statutory provisions governing a request for a change of judge for cause. Although the procedures of Rule 51.05 sometime supersede the statutory procedures, *Hough,* 819 S.W.2d at 752, since Rule 51.05 is inapplicable, the provisions of §§ 508.090–.140 control.

### Direct Appeal

Isaiah raises five points on appeal. In his first point, Isaiah contends the trial court erred in overruling his motion to suppress statements made to Detective Albert DeValkenaere on the basis that the statements were taken in violation of his privilege against self-incrimination. Isaiah asserts that his post-*Miranda*[5] statements made to DeValkenaere were inadmissible as "fruits of the poisonous tree" because they followed directly upon allegedly unconstitutional custodial interrogation. Isaiah claims that the questioning that took place during his initial interview with DeValkenaere to obtain general background information constituted improper interrogation in violation of his rights against self-incrimination. He further argues that because such pre-*Miranda* questioning was improper, the subsequent statements made to the detective after being advised of his *Miranda* rights were impermissibly tainted and should have been suppressed.

 In reviewing a trial court's order on a motion to suppress, this court must affirm the court's ruling if the evidence is sufficient to sustain the court's findings. *State v. Brown,* 814 S.W.2d 304, 307 (Mo. App.1991). This court considers all facts and reasonable inferences favorable to the challenged order and is free to disregard any contrary evidence and inferences when sufficient evidence supports the trial court's ruling. *Id.*

 In order for *Miranda* to be applicable, "an individual must be both in custody and interrogated." *State v. Kent,* 697 S.W.2d 216, 217 (Mo.App.1985) (quoting *State v. O'Toole,* 619 S.W.2d 804, 810 (Mo.App. 1981)). The term "interrogation" for *Miranda* purposes refers to:

> [N]ot only express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).

 Not all government inquiries to a suspect in custody constitute "interrogation" within the scope of *Miranda.* *United States v. McLaughlin,* 777 F.2d 388, 391 (8th Cir. 1985). Requests for basic background information for purposes of identification generally do not constitute "interrogation." *Id.* at 391–92. Moreover, questioning that occurs during routine police booking procedures which is not "part of any process of interrogation designed to elicit any inculpatory statements" does not constitute "interrogation" as proscribed by *Miranda.* *State v. Jordan,* 506 S.W.2d 74, 83 (Mo.App.1974).

In the present case, the record shows that Isaiah went to the police station around 10:00

---

**5.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

p.m. on October 23, 1989, to meet with police. Isaiah told police that he had been informed that someone had shot his wife and he had come to the police station to clear his name. Isaiah was subsequently arrested and taken to the detention unit.

At the suppression hearing, Detective DeValkenaere testified that his first contact with Isaiah was at 10:30 p.m. when he signed Isaiah out of the detention unit in order to take him to the homicide unit to be interviewed. DeValkenaere further testified that he brought Isaiah to the interrogation room where he obtained general background information, i.e., Isaiah's address, education, names of relatives, etc., as part of a routine investigative report which was a standard procedure. DeValkenaere indicated that it took about ten minutes to fill out the general background information document and that during this time no questions were asked relating to the offense.

The record reflects that at approximately 10:45 p.m., after DeValkenaere had completed the initial interview, he advised Isaiah of his *Miranda* rights. The record also shows that Isaiah knowingly and voluntarily signed a waiver of those rights. After signing the waiver, Isaiah spoke with DeValkenaere for approximately fifteen minutes. During that time, Isaiah told the detective that he had been playing basketball at the time his wife was shot and that he did not know anything had happened until he got home and his mother told him. DeValkenaere testified that he informed Isaiah that his mother-in-law had identified him as the person who shot her and Vanessa. At that point, Isaiah indicated to the detective that he had nothing further to say and DeValkenaere immediately terminated the interview.

It is undisputed that Isaiah was in custody at the time he made statements to DeValkenaere. The only question is whether the questions asked by the detective for the purpose of filling out a general background document constituted "interrogation" for purposes of *Miranda*.

Isaiah contends that this case is controlled by *Westover v. United States*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[6] In *Westover*, the defendant had been in custody of the Kansas City police for over fourteen hours and had been interrogated at length

during that period of time by police and was subsequently questioned by FBI agents. The defendant was later convicted on robbery charges. The Court reversed the convictions on the basis that the confession obtained by FBI officials came only after the defendant had been subjected to "pressure applied by the local in-custody interrogation" and, as a result, the defendant had not knowingly and intelligently waived his right to remain silent and consult with counsel prior to making a statement to government officials. *Id.* at 495–97, 86 S.Ct. at 1638–40.

In this case, however, the issue is whether the pre-*Miranda* questioning constituted "interrogation." In *Westover*, there was no dispute as to whether the questioning by police and FBI agents constituted "interrogation" for purposes of *Miranda*. Rather, the issue was whether the defendant had been properly advised of his rights and whether he knowingly and intelligently waived those rights prior to interrogation. As such, *Westover* is not controlling here.

 In the present case, the record shows that the only comments elicited from Isaiah by DeValkenaere during his pre-*Miranda* interview pertained to routine background information. There is nothing in the record to indicate that the questions asked during this brief interview constituted the type of interrogation designed to elicit incriminating statements from Isaiah. Nor is there any indication that Isaiah made incriminating statements during the pre-*Miranda* interview. Moreover, Devalkenaere testified that during this time there were no questions asked that related to the offense. This court defers to the trial court's assessment with regard to determining the credibility of witnesses. *Brown*, 814 S.W.2d at 307. As such, this court finds that the questions asked of Isaiah for purposes of obtaining routine background information did not constitute "interrogation" within the meaning of *Miranda*. Therefore, the statements made to DeValkenaere were properly admitted.

---

6. *Westover* is reported in the same opinion as *Miranda*, 384 U.S. 436, 86 S.Ct. 1602.

In his second point, Isaiah contends the trial court plainly erred and abused its discretion in failing to declare a mistrial, sua sponte, because it improperly allowed the prosecuting attorney to use the word "murder" throughout the cross-examination of Isaiah and in failing to declare a mistrial following the prosecutor's questioning of State witness, Brenda Briscoe.

■ Because this claim of error was not properly preserved for appellate review, Isaiah requests plain error review. In reviewing claims based on plain error, relief may be granted only where the appellant has shown that prejudicial error occurred and that manifest injustice or a miscarriage of justice will result if the alleged error is left uncorrected. *State v. Jennings*, 815 S.W.2d 434, 442 (Mo. App.1991).

■ The reaction of the trial court to trial error and alleged misconduct is within its discretion. *State v. Chaney*, 663 S.W.2d 279, 287 (Mo.App.1983). The trial court has a "superior vantage point from which to assess the pervasive effect of a prejudicial statement and whether it can be dissipated by timely and appropriate action short of declaring a mistrial." *Id.* (quoting *State v. Charles*, 542 S.W.2d 606, 611 (Mo.App.1976)). An instruction to the jury to disregard an improper comment is generally sufficient to cure the impropriety. *Id.*

■ The declaration of a mistrial is a drastic remedy which is appropriate only in extraordinary circumstances. *State v. Drewel*, 835 S.W.2d 494, 498 (Mo.App.1992). Moreover, "[s]ua sponte action should be exercised only in exceptional circumstances." *Id.* In cases of prosecutorial misconduct, the drastic remedy of a mistrial should not be employed unless the misconduct results in prejudice to the defendant to the extent that the court's instruction will not remedy the error. *Chaney*, 663 S.W.2d at 287.

■ Isaiah does not direct the court to any cases which have held that it is error for a prosecutor to refer to the killing of a victim as a "murder" when the facts of the case support such a statement. "The prosecutor has the right to draw any inference from the evidence that he believes in good faith to be justified." *State v. Harris*, 824 S.W.2d 111, 115 (Mo.App.), *cert. denied*, — U.S. —, 113 S.Ct. 88, 121 L.Ed.2d 51 (1992). Isaiah's defense was not that the killing of his wife was an accident or in self-defense, but rather that he did not deliberate before killing her. The evidence in the case at bar demonstrates that the term "murder" was an accurate description of the killing of Vanessa Isaiah.

■ Isaiah claims that he was denied a fair trial, however, because the State's repeated references to the shooting incident as "murder" improperly appealed to the passions and prejudices of the jurors. It is not necessary to reach the merits of such a claim, because any alleged impropriety in the prosecutor's references was sufficiently cured when the objections were sustained and the jury instructed to disregard such reference.

■ The record shows that the prosecuting attorney mentioned the word "murder" four times during cross-examination of Isaiah. No objection was made after the first reference. Defense counsel objected the second and third times and the trial court sustained the objections and instructed the jury to disregard the questions. After making a fourth reference, the prosecuting attorney corrected herself in mid-sentence and no objection was made. The trial court in this case sustained each objection and directed the jury to disregard the question. This court is not convinced that the failure of the trial court to declare a mistrial, sua sponte, constitutes plain error.

■ Isaiah also claims the prosecutor improperly questioned the State's witness Brenda Briscoe. Specifically, Isaiah objects to the question posed to Briscoe as to whether her sister (Vanessa) had done anything to Isaiah "to justify her being executed by him eight dates (sic) later." Defense counsel immediately objected and the court sustained the objection. No further relief was requested. The record shows that a nearly identical question [7] was posed to the same witness a

---

7. The prosecutor asked: "To your knowledge, did [Vanessa] ever do anything to [Isaiah] that would justify her death?"

few moments later, yet it was not objected to, nor was any other relief requested by counsel. Although the prosecutor's first question was improper, an objection was made and sustained. This court does not believe that the prosecutor's question resulted in any manifest injustice or that Isaiah was denied a fair trial as a result of it.

In Point III, Isaiah contends the trial court plainly erred in failing to declare a mistrial, sua sponte, during the prosecutor's closing argument because the prosecutor mischaracterized the evidence, improperly defined "reasonable doubt," and argued Isaiah's bad character before the jury.

 The trial court has broad discretion in controlling closing arguments and determining the propriety of remarks made during such arguments. *State v. Counts*, 671 S.W.2d 818, 820 (Mo.App.1984). Relief is rarely granted on the basis of plain error for matters included in closing argument. *State v. Hatcher*, 835 S.W.2d 340, 343 (Mo.App. 1992). The trial court's ruling will be reversed only upon a substantial showing that defendant has suffered manifest injustice from the alleged error. *Id.* at 344. "[A]lleged errors committed in closing argument do not justify relief under the plain error rule unless they are determined to have a decisive effect on the jury." *State v. Sidebottom*, 753 S.W.2d 915, 920 (Mo. banc), *cert. denied*, 488 U.S. 975, 109 S.Ct. 515, 102 L.Ed.2d 550 (1988).

Isaiah first argues that the prosecutor improperly defined "reasonable doubt" to the jury. The record reflects the following remarks made by the prosecutor during closing argument:

And if you recall in [the assisting prosecutor's] . . . earlier remarks that he made, he described to you the State of Missouri's burden of proof in this case, which is proof beyond a reasonable doubt. And the judge has just finished instructing you, reading you a written instruction which will guide you in your deliberations on reasonable doubt.
You recall that you have taken an oath to follow the law and that is exactly what is contained in those written instructions that the Judge has given you, nothing more, nothing less, those are your instructions,

that is the law. And within that regard, the judge has instructed you upon reasonable doubt. And I would like to call to your attention specifically some of the words in that definition and urge them to you at this time. The Judge mentioned your common sense working with reasonable doubt, and that is so important. I want to tell you that it is your obligation as a juror to resolve any conflict in the testimony. **I also want to tell you that simply the fact that a conflict exists does not in and of itself make a reasonable doubt. A reasonable doubt would be a doubt based on reason, not speculation, raised by the evidence, not anything else as it relates to the elements of the offense or the four offenses in this case. And for that you very much do need your common sense.**

(Emphasis added to denote portion of closing argument claimed to be improper).

 It is not considered error for an attorney to make reference to or discuss "reasonable doubt" during closing argument. *Hatcher*, 835 S.W.2d at 345. Moreover, counsel may point out to the jury that not every doubt is a reasonable doubt. *Counts*, 671 S.W.2d at 820. A discussion of reasonable doubt will not be considered reversible error so long as the attorney does not attempt to substitute his own definition. *State v. Acklin*, 737 S.W.2d 743, 747 (Mo.App. 1987).

 The statement by the prosecutor that "[a] reasonable doubt would be a doubt based on reason, not speculation, raised by the evidence, not anything else as it relates to the elements of the offenses or the four offenses in this case," comes close to being a substitution of the prosecutor's own definition of reasonable doubt. The remarks, however, follow a statement by the prosecutor informing the jurors that they are obliged to follow the law as stated in the instructions. Under plain error review, Isaiah has not shown that he suffered from manifest injustice requiring reversal.

 Isaiah further claims the trial court plainly erred in failing to declare a mistrial after the prosecutor stated that immediately

preceding the shooting incident, Isaiah approached the victim's car and said, "You won't talk to me Vanessa, bye." Defense counsel objected to the remark as a misstatement of evidence and the court ruled that "the jury remember (sic) will recall the evidence." Isaiah argues that in misstating of evidence, the prosecutor implied to the jury that Isaiah had planned to shoot Vanessa because he told her "bye" moments before shooting her.

The State concedes that the evidence adduced at trial indicates that Isaiah actually had said, "You won't talk to me Vanessa." While it is improper for counsel to comment or refer to matters not in evidence, this court is unable to conclude that this brief misstatement resulted in an unfair trial. The trial court's admonition that the jury should rely on their own recollections was a proper ruling. The challenged remarks, in light of the court's response, do not rise to the level of manifest injustice.

Isaiah further claims the prosecutor improperly argued his bad character before the jury. In the first part of the State's closing, Isaiah claims the following argument is improper:

> I'm also going to ask you to punish him in the maximum amount for making Etoy Jones witness her daughter's execution. For that, in addition to the fact of his shooting her, he must be punished. I would like for you to picture in your mind the horror of Etoy Jones.... Its [sic] an unnatural thing for a mother to experience the loss of a child. Most mother's [sic] expect to die before their children die.... Its [sic] an even more unnatural thing to experience the loss of your child as the—as a result of a homicide. But nothing could be more unnatural than to experience the loss of your child at a homicide that occurs before your eyes ladies and gentlemen. To hear the screams of your child begging for her life from her husband to her, the last words out of her mouth being concerned for you, "Let my mama live." "Let my mama go." That's the last thing Etoy Jones can remember her daughter saying. And for that ladies and gentlemen punish him in the maximum.

In the rebuttal portion of the State's closing argument, the relevant portion is as follows:

> The State of Missouri has presented one day in the life of Darrell Isaiah, and in that day what did you learn about the man? What did you learn about what's in his heart? What did you learn about what's in his mind? You learned that Darrell Isaiah is the kind of man that puts his wife in jail. He's the kind of man who thinks his wife is property. And that he can speak to her or do with her as he wishes. You learned that he's a man who rides around in the neighborhood acting as muscle to help his friends in a potential shooting. You learned he's the kind of man who will go act as an enforcer, his nephew has been threatened. You learn he's the kind of man that will skip work to play basketball with his friends or to ride around helping them in the neighborhood vigilante behavior and most importantly ladies and gentlemen, you learned that he's the kind of man that asks his friends to lie for him. What does that tell you about his heart? What does that tell you about his mind? Defense counsel stands in front of you and talks with you at length about inconsistencies from the testimony of the State's witnesses. She talks about everything except six shots fired at the location by this murderer. Her explanation is that he's telling you the truth and all the rest of them are lying. You don't need anything more than your common sense to answer that question. I'm going to ask you to punish the man in addition to punishing the crime. And think about what you've learned in your brief foyer [sic] into looking into the heart and mind of this murderer. And you'll learn that the only thing you want to do with him is put him so far back in the penitentiary that they will have to pipe daylight to him.

Isaiah asserts that the State's closing remarks were improper and a mistrial is "the only remedy which could cure the error." In support of his claim of plain error, Isaiah cites one case, *State v. Shepard*, 654 S.W.2d 97 (Mo.App.1983), where it was reversible error for the prosecutor to state that defendant had previously pled guilty to a reduced

misdemeanor charge and for the trial court to admit into evidence the docket sheet of the unrelated case showing that the defendant was originally charged with a felony which was reduced to a misdemeanor. *Shepard* is not persuasive because the prosecutor's argument in that case is not comparable to the argument of the prosecutor in the case at bar.

■ Here, the events recounted by the prosecutor during closing argument were generally based on matters properly admitted into evidence at trial and the comments made by the State based upon inferences drawn from those matters were permissible. "A prosecutor is given wide latitude in making closing argument and may properly comment on matters in evidence and ... draw reasonable inferences therefrom." *State v. Powell*, 793 S.W.2d 505, 508 (Mo.App.1990).

■ One portion of the rebuttal argument, where the prosecutor urged the jury "to punish the man as well as the crime," warrants separate consideration. By inference, it appears that the State is asking the jury to punish Isaiah for other bad acts or uncharged crimes. That type of argument is impermissible. *See State v. Beck*, 745 S.W.2d 205, 208–09 (Mo.App.1987). These remarks were in the context of the State's response to defense counsel's request that the jury look into the heart and mind of Isaiah. The argument of defense counsel, and then the prosecutor, encouraged the jury to consider Isaiah's character when assessing his credibility. This type of argument is permissible. *State v. Mallett*, 732 S.W.2d 527, 536–37 (Mo. banc), *cert. denied*, 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987).

■ Considering the context of the statements of the prosecutor, it is not clear whether the State was improperly urging the jury to convict Isaiah on the basis of other bad acts or if it was properly suggesting that Isaiah's character should be considered on the issue of credibility. If a contemporaneous objection had been made to such an argument, it is likely that it would have been sustained. But Isaiah is claiming that the trial court erred in not, sua sponte, granting a mistrial, and Isaiah has not met his heavy burden of proving manifest injustice. Point denied.

In Point IV, Isaiah contends the trial court plainly erred in permitting the prosecutor to elicit hearsay testimony from Kevin Williams regarding a statement that Vanessa had made to him prior to her death. The record shows that at trial, the prosecutor asked Williams to tell the jury what Vanessa had told him three weeks before her death that made him believe she was afraid of Isaiah. Williams responded that Vanessa had told him that Isaiah "is crazy enough to kill me." There was no objection made by defense counsel. Because this claim was not properly preserved for appellate review, Isaiah requests plain error review.

■ Subject to certain limitations, the declarations of a decedent may be admitted to prove the decedent's state of mind as long as the statements are relevant. *State v. Singh*, 586 S.W.2d 410, 417 (Mo.App.1979). In *Singh*, the Southern District explained the distinction between hearsay and non-hearsay statements for the purpose of determining whether to admit such statements based on the state-of-mind exception to the hearsay rule. In that case, the court noted that:

> A distinction is often drawn between direct assertions of a state of mind (I am afraid of X) and statements which inferentially establish a state of mind (I won't go near X). The former is said to be hearsay and is admitted as an exception to the rule. The latter is said not to be hearsay and is thereby admissible.

*Id.* at 417.

■ In this case, the State claims that the out-of-court statement was not offered to prove the truth of the assertion, but rather to show Vanessa's mental state prior to her death, i.e., her fear of Isaiah near the time of her death. The State is correct that the statement, "he is crazy enough to kill me," is not a direct assertion of Vanessa's state of mind, but rather inferentially demonstrates Vanessa's state of mind. Therefore, the statement does not constitute hearsay.

■ The fact that Williams' testimony is not hearsay does not automatically make it admissible; it must be relevant. "Evidence

is relevant if it tends to prove or disprove a fact in issue, or if it corroborates evidence that is relevant and bears on a principal issue." *Powell,* 793 S.W.2d at 507. Declarations of a decedent demonstrating the dece-. dent's state of mind are clearly "relevant in instances where the defenses of self-defense, suicide or accident are employed." *State v. Luster,* 750 S.W.2d 474, 477 (Mo.App.1988). *See also Singh,* 586 S.W.2d at 419. Isaiah did not employ any of these defenses. The state of mind of a decedent may be relevant for purposes other than to rebut a defense such as *self-defense, suicide or accidental death.* The Supreme Court has held that a trial court did not abuse its discretion in admitting evidence of the victim's state of mind under circumstances similar to those in the case at bar. *State v. Boliek,* 706 S.W.2d 847, 850 (Mo. banc), *cert. denied,* 479 U.S. 903, 107 S.Ct. 302, 93 L.Ed.2d 276 (1986) (no abuse of discretion in permitting testimony of witnesses that, in the days before the departure of the victim from Kansas City, the victim stated that she feared the defendant was going to kill her).

■■■ Since Isaiah has not shown that it would have absolutely been erroneous to admit Williams' testimony over objection, he has not established manifest injustice in the trial court's failure to sua sponte declare a mistrial. In addition, overwhelming evidence established Isaiah's guilt. "Where defendant's guilt is established by overwhelming evidence, no injustice or miscarriage of justice results from refusal to invoke the plain error rule." *State v. Salkil,* 837 S.W.2d 367, 370 (Mo.App.1992). Isaiah is not entitled to plain error relief. Point IV is denied.

■■■ In his final point, Isaiah contends the trial court plainly erred in giving Instruction No. 4, patterned after MAI–CR3d 302.-04. Isaiah asserts that the definition of "proof beyond a reasonable doubt" as proof that leaves the jurors "firmly convinced" of the defendant's guilt impermissibly lowers the burden of proof imposed on the state, thus allowing the jury to find him guilty based on a lesser degree of proof than is required by due process. Identical challenges have been consistently rejected by the Missouri Supreme Court which has repeated-

ly upheld the definition as constitutionally sound. *State v. Griffin,* 848 S.W.2d 464, 469 (Mo. banc 1993); *Ervin,* 835 S.W.2d at 924. This court is bound to follow the last controlling decision of that court. Isaiah waived any objection to Instruction No. 4 and he is not entitled to relief for plain error. *State v. Lumpkin,* 850 S.W.2d 388, 394 (Mo.App. 1993). Point denied.

The judgment of the trial court is affirmed. The judgment of the motion court is reversed and remanded for further proceedings in accordance with this opinion.

All concur.